IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TRUSTEES OF THE CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND, *et al.*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | No. 09 C 322 |
| CONFORTI CONSTRUCTION COMPANY, INC., | ) ) ) | Magistrate Judge Sidney I. Schenkier |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On January 19, 2009, the plaintiffs, Trustees of the Chicago Regional Council of Carpenters Pension Fund, Chicago Regional Council of Carpenters Welfare Fund, and Chicago Regional Council of Carpenters Apprentice & Trainee Program Fund ("the Funds") sued Conforti Construction Company, Inc. ("CCC") to recover delinquent benefit contributions owed for the period of January 1, 2004 through March 31, 2009 (doc. # 35: Plaintiffs' Rule 25(c) Motion to Substitute a Party Defendant ("Pls.' Mot.") at 1). Pursuant to a settlement reached between the Funds and CCC, the Court entered an Agreed Judgment Order on July 12, 2010, with CCC agreeing to satisfy the judgment of $190,000.00 through nine monthly installments (Pls.' Mot. at Ex. A; doc. # 32).

Thereafter, CCC failed to make any of the payments set forth in the Agreed Judgment Order. As a result, on February 15, 2013, the Funds filed a motion pursuant to Rule 25(c) of the Federal Rules of Civil Procedure, seeking to substitute Conforti Construction Services, Inc.

("CCS") as a party defendant liable for the $190,000.00 judgment (Pls.' Mot. at 1-2). The Funds seek to substitute CCS as the defendant under a theory of successor liability (*Id.* at 4). In the alternative, the Funds request that the Court allow for limited discovery solely on the successorship question (*Id.* at 8-9). For the reasons stated below, we deny the motion in its entirety.

## I.

At the threshold, we consider CCS's argument that the motion should be denied for lack of proper service. Pursuant to Federal Rule of Civil Procedure 25(c), a motion to substitute parties "must be served as provided in Rule 25(a)(3)." In turn, Rule 25(a)(3) provides that a motion "must be served . . . on non-parties [such as CCS] as provided in Rule 4," and pursuant to Rule 4(h)(1)(B), a domestic corporation, such as CCS, must be served "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service . . . ."

CCS contends that the Funds failed to properly serve their Rule 25(c) motion on CCS because the motion was not served on a CCS officer or on its registered agent (doc. # 42: CCS's Response to Plaintiffs' Rule 25(c) Motion to Substitute a Party Defendant ("CCS Resp."), Conforti Aff. ¶ 31). Rather, the motion was served on the law firm of Allocco, Miller, & Cahill, P.C. ("Allocco"), which was not authorized to accept service of process for CCS and had been retained only to handle the company's audit disputes during October 2009 (CCS Resp. at 8).

There is a strict requirement for valid service. *Mid-Continent Wood Products, Inc. v. Harris*, 936 F.2d 297, 300-03 (7th Cir. 1991); *Indiana Ins. Co. v. Barnes*, No. 98 C 1272, 1998 WL 440896, at *1 (N.D. Ill. July 27, 1998); *Commonwealth Edison Co. v. Diversified Technologies Grp., Inc.*, No. 93 C 4138, 1993 WL 479046, at *3 (N.D. Ill. Nov. 17, 1993).

"Without proper service of process, a court cannot exercise personal jurisdiction over a defendant." *Naylor v. Streamwood Behavioral Health Sys.*, No. 11 C 50375, 2012 WL 5499441, at *6 (N.D. Ill. Nov. 13, 2012). "[T]he service requirement is not satisfied merely because the defendant is aware that he has been named in a lawsuit or has received a copy of the summons and the complaint." *United States v Ligas*, 549 F.3d 497, 500 (7th Cir. 2008); *see also Homer v. Jones-Bey*, 415 F.3d 748, 758 (7th Cir. 2005). A signed return of service constitutes *prima facie* evidence of proper service, which can only be overcome by strong and convincing evidence presented by the party opposing service. *Homer*, 415 F.3d at 752.

Here, the Funds have presented no signed return of service. Indeed, the Funds did not respond to this argument at all. Consequently, we accept CCS's uncontradicted assertion that Allocco was not authorized to accept service for CCS. "In order for service on an attorney to constitute proper service on a party, the attorney must be specifically authorized by the defendant to perform that particular task." *Guess?, Inc. v. Chang*, 163 F.R.D. 505, 507-08 (N.D. Ill. 1995); *see also Oncology Therapeutics Network Joint Venture, L.P. v. Olympia Fields Internal Medicine Assocs., S.C.*, No. 01 C 2079, 2003 WL 21183850, at *2 (N.D. Ill. May 15, 2003) (citing *Trotter v. Oppenheimer & Co. Inc.*, No. 96 C 1238, 1997 WL 102531, at *2, n. 4 (N.D. Ill. Mar. 4, 1997) (service on a party's attorney is insufficient unless the party specifically appointed attorney for that purpose)).

We therefore conclude the service of process was improper in this case, and that the motion to substitute could be denied on that basis alone. However, because the Funds could correct this defect by properly serving CCS, we address the substance of the Funds' argument to explain why, on the merits, it fails.

## II.

Rule 25(c) is a procedural mechanism, which does not determine any substantive issues that may be involved in the action. *ISI Int'l v. Borden Ladner Gervais, LLP*, No. 98 C 7614, 2002 WL 230904, at *1 (N.D. Ill. Feb. 15, 2002), *aff'd*, 316 F.3d 731 (7th Cir. 2003). Substitution of the parties under Rule 25(c) is within the discretion of the court. *Id.* Under ERISA, we analyze successor liability applying federal common law standards. *See Teed v. Thomas & Betts Power Solutions, LLC*, 711 F.3d 763, 764 (7th Cir. 2013); *Upholsters' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327-29 (7th Cir. 1990).

Under these standards, successor liability applies when: (1) there was substantial continuity in the business operations of the predecessor and successor; and (2) the successor employer had prior notice of the claim against the predecessor before the acquisition. *See Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 674 (7th Cir. 2011); *Chicago Regional Council of Carpenters Pension Fund, et al. v. Estate Installations*, No. 11-cv-2924, 2013 WL 500833, at *2 (N.D. Ill. Feb. 8, 2013); *see also Chicago Truck Drivers, Helpers & Warehouse Workers Unions (Indep.) Pension Fund v. Tasemkin, Inc.*. 59 F.3d 48, 49 (7th Cir. 1995). Although successor liability traditionally applied only when assets were sold, it is an equitable doctrine that has been extended to encompass "any reorganization that results in a substantial continuation of the business by the successor and either obliterates the previous business or leaves it as an 'empty shell'." *Cent. States, Se. & Sw. Areas Pension Fund v. TAS Inv. Co. LLC*, No. 11-cv-2991, 2013 WL 1222042, at *7 (N.D. Ill. Mar. 25, 2013) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Wiseway Motor Freight, Inc.*, No. 99 C 4202, 2000 WL 1409825, at *6 (N.D. Ill. Sept. 26, 2000)).

The parties here dispute both elements of successor liability. We address each element in turn.

## A.

The continuity element requires that "the new company has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Chicago Regional Council of Carpenters Pension Fund,* 2013 WL 500833, at *2 (internal quotations omitted); *cf. Canteen Corp. v. NLRB,* 103 F.3d 1355, 1361 (7th Cir. 1997). The determination of whether there is sufficient continuity for one company to be a successor of another company is a factual question to be decided based on the totality of the circumstances *Chicago Regional Council of Carpenters Pension Fund,* 2013 WL 500833, at *2. In making that case-specific assessment, we review such factors as whether:

> the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

*Id.* In *Upholsterers' International,* the Seventh Circuit found the following factors evidenced continuity of operations: the successor's employment of "substantially all" of the predecessor's workforce, including supervisors and vice presidents; its use of the predecessor's plant, machinery, and equipment to produce the same products; its completion of the predecessor's unfinished work orders, and its agreement to honor the predecessor's warranties. *Upholsterers' Int'l,* 920 F.2d at 1329. In considering these types of facts, we find that the requisite substantial continuity is not present in this case.

The uncontradicted evidence is that CCS never acquired any assets from CCC (CCS Resp., Aff. at ¶ 13). Likewise, the uncontradicted evidence is that (a) CCS did not take over any

CCC construction projects after CCC's operations wound down; and (b) CCC and CCS do not share the same location, machinery, or equipment (*Id.* at ¶¶ 11, 14-15).

Additionally, the two companies had different supervisors (CCS Resp., Aff. at ¶ 17), as well as different owners and officers. Robert Conforti, Sr. ("Conforti, Sr.") is the sole owner and president of CCC, and Robert Conforti, Jr. ("Conforti, Jr.") is the sole owner and president of CCS (*Id.* at ¶¶ 5-6, 8). Conforti, Jr. started CCS with his own personal funds, and Conforti, Sr. never had any ownership interest or involvement in CCS's operations (*Id.* at ¶ 5, 6). Although Conforti, Jr. was previously Vice President and a ten percent shareholder at CCC, he had not held this position or owned shares in CCC for nearly four years when he incorporated CCS in 2008 (*Id.* at ¶¶ 7-8). Conforti, Jr. did continue to work as an estimator for CCC until he incorporated CCS in 2008 (*Id.* at ¶ 7), but the fact that he once worked for CCC is insufficient, standing alone, to establish that CCS is a successor to CCC. *See Chicago Regional Council of Carpenters Pension Fund,* 2013 WL 500833, at *1-3 (finding no sufficient continuity where an employee for a window installation company began his own window installation company with his own funding and without any assets from his former employer).

The Funds' claim that CCS picked up where CCC left off (Pls.' Mot. at 5) relies mainly on the assertion that the two companies shared some clients and employees. However, only two of CCS's twenty-three clients were previously clients of CCC, which had fifty-four clients (CCS Resp., Ex. B at 9-11). Such minimal overlap of clients does not demonstrate sufficient continuity between the companies to weigh in favor of a finding of successorship. *See Chicago Regional Council of Carpenters Pension Fund,* 2013 WL 500833, at *4 (finding that the majority of the alleged successor's contracts coming from clients that never worked with the predecessor supports a lack of continuity).

The Funds point out that five persons went to work for CCS immediately after receiving their last paycheck for CCC, and that all but one of CCS's employees came from CCC (Pls.' Mot. at 6). However, the record is devoid of evidence demonstrating that these employees worked in the same conditions or reported to the same supervisor as at CCC. *See Chicago Regional Council of Carpenters Pension Fund*, 2013 WL 500833, at *4 (finding insufficient continuity where the alleged successor hired former employees of the predecessor but the employees were not shown to have worked in the same conditions or reported to the same supervisor). To the contrary, the evidence shows that CCC and CCS did not share supervisors (CCS Resp., Aff. at ¶ 17). Moreover, while both CCC and CCS performed carpentry and related construction work for general contractors in Chicago and its suburbs, CCS also performs work in the medical industrial construction markets, which CCC did not (*Id.* at ¶ 9). *See Chicago Regional Council of Carpenters Pension Fund*, 2013 WL 500833, at *3 (sufficient continuity not established where two companies performing some similar work while engaging in other different services).

In aid of their successorship claim, the Funds also assert that both companies shared the same Wage and Fringe Benefit Bond with State Farm, as evidenced by a letter from a State Farm underwriter dated January 3, 2009, stating that CCS's bond (93 BH N5702) replaced that of CCC's (Pls.' Mot. at 7 and Ex. G at 2). CCS disputes this assertion, pointing to an email from their State Farm agent dated February 18, 2013 stating that this bond was new, had a different number than the CCC bond, and was not set up as a continuation of the CCC bond (CCS Resp. at 15; Aff. at ¶ 21; Ex. C at 12). In light of this conflicting evidence, the bond does not weigh in favor of successorship, and in any event would not overcome the evidence that shows a lack of continuity.

**B.**

In addition, the evidence offered by the Funds fails to show that CCS had prior notice of CCC's liability to the Funds. The notice requirement for successor liability can be satisfied "not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances." *Upholsterers' Int'l*, 920 F.2d at 1329. The notice requirement is crucial because "it would be inequitable to hold a successor liable when it was unable to take the liability into account in negotiating the acquisition price . . .." *Id.* at 1327. CCS denies that it had notice of CCC's audit liability when Conforti, Jr. created and started operating CCS (CCS Resp., Aff. at ¶ 29). The Funds' arguments to the contrary lack merit.

The Funds contend that CCS had notice because the agreed judgment against CCC resulted from a claim based on an audit for the period of 2004 to 2009, and Conforti, Jr. was an officer of CCC for part of that time. (Pls.' Mot. at 7). That argument is a nonstarter. Although Conforti, Jr. was still an officer and shareholder in CCC at the start of the period covered by the audit, he had resigned as an officer and sold his shares in June 2004, only six months after the start of the audit period (CCS Resp., Aff. at ¶¶ 7-8; Ex. A at 6-8). Further, the audit of CCC did not commence until 2009, well after Conforti, Jr. ceased performing any work for CCC and well after he had established CCS (CCS Resp., Aff. at ¶ 5, 7).

The Funds also assert that CCS had notice of the liability because Conforti, Sr. spoke with Conforti, Jr. about the audit of CCC and the settlement of the lawsuit (Pls.' Mot. at 7-8). However, the audit in 2009 and the settlement of the lawsuit in 2010 could not have given CCS notice of CCC's liability as of 2008, when CCS was established and began operations.

Finally, the Funds contend that CCS had notice of CCC's liability because the two companies hired the same law firm to represent them during the audits of CCC and CCS that commenced in 2009 (Pls.' Mot. at 7-8). It is true that both CCC and CCS retained Allocco to represent them in the Funds' 2009 audits of their companies (CCS Resp., Ex. E at 15; Pls.' Mot., Ex. A at 2-4). However, this does not automatically mean that CCS had notice of CCC's liability. *See Trustees of Chicago Plastering Institute Pension Trust v. Elite Plastering Co., Inc.*, 603 F. Supp. 2d 1143, 1149-50 (N.D. Ill. 2009) (finding notice could not be imputed to successor based on attorney's knowledge of potential liability of predecessor where the attorney was not involved in any transfer of interest between the two companies). Here, Allocco was retained by CCS solely for the purpose of the audit of CCS. There is no evidence that either Allocco or CCC advised CCS of the results of the CCC audit prior to entry of the agreed judgment. And, again, CCC's retention of counsel in October 2009 provides no evidence that it had knowledge of CCC's possible liability in 2008 when CCS was created and began operations – and well before the audit of CCC even had commenced.

Because the Funds have not satisfied the elements of substantial continuity or notice sufficient for us to impose successor liability upon CCS, we find it unnecessary to address CCS's argument that Rule 25(c) does not apply to transfers that occur prior to the commencement of the litigation.

### III.

Finally, we deny the Funds' request for limited discovery solely on the issue of CCS's potential liability as a successor to CCC (Pls.' Mot. at 8-9). The Funds have already conducted audits of CCC and CCS (Pls.' Mot. at Ex. H). As discussed above, the evidence from those audits do not support the Funds' contention that CCS was a mere continuation of CCC. Further,

the Funds have not specified what information they believe that they could obtain from further discovery. For these reasons, the Funds' request for limited discovery is denied.

## CONCLUSION

In closing, we note that some of the evidence on which the Funds' rely for their motion was in their possession prior to the time they filed this action on January 19, 2009 – such as the letter dated January 3, 2009, which they cite for the proposition that CCC and CCS shared the same Wage and Fringe Benefit Bond (Pls.' Mot. At 7 and Ex. G). Moreover, the Funds had the audit results they claim show successorship as of July 2009 (*Id.* at Ex. H), about one year before the Court entered the agreed judgment between the Funds and CCC. In light of CCC's failure to pay the judgment amount and the Funds' difficulty in collecting from CCC, we understand the Funds' motivation for seeking to replace CCC with a pocket that may be more solvent.

What we do not understand is why, in light of the evidence the Funds now say supports a finding of successorship, the Funds failed to seek to substitute or join CCS as a defendant prior to the entry of judgment. Had the Funds been able to successfully bring CCS into the case while it was being litigated, CCS would have been at the bargaining table and would have had an opportunity to help shape the settlement that resulted in an agreed judgment – or, conversely, would have the option to forego settlement in favor of litigation. Instead, the Funds now seek to bind CCS to a $190,000.00 judgment that was agreed to between a defunct CCC and the Funds, and that CCS (which the Funds now say was at the time already the successor to CCC) had no say in negotiating. Even if the Funds had made out a persuasive case for a finding of successorship (which for the reasons discussed above they have failed to do), the Court would

have great pause about whether it should exercise its discretion to bring CCS into the case and tie it to a judgment in these circumstances.

Plaintiffs' motion to substitute a party defendant is denied, as is their request for limited discovery.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATE: July 17, 2013